IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JASON JEFFERSON,

    Plaintiff,

v.                                                                     Civil Action No. **3:14CV56**

DUANE GRAY, *et al.*,

    Defendants.

### MEMORANDUM OPINION

Jason Jefferson, a former Virginia detainee proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. § 1983.[1] Jefferson alleges that Defendants Duane Gray and Y. King ("Defendants"), Mental Health Clinicians for the Henrico County Jail, subjected him to punishment in violation of the Fifth and Fourteenth Amendments. (Particularized Complaint ("Complaint") 9, ECF No. 23.)[2] The matter is before the Court on the Defendants' Motion for Summary Judgment. (ECF No. 46.) Jefferson has responded. (ECF No. 48.) Defendants filed a Rebuttal Brief (ECF No. 49), to which Jefferson filed an additional response (ECF No. 51). The matter is ripe for disposition. For the reasons stated below, the Court will grant Defendants' Motion for Summary Judgment.

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] The Court employs the pagination assigned to the CM/ECF docketing system for citations to Jefferson's submissions.

## I. SUMMARY OF CLAIMS

Jefferson claims that the Defendants were deliberately indifferent to his bipolar disorder and depression during his detention in the Henrico County Jail. Jefferson alleges that he was in need of his medication for bipolar disorder, the Defendants ignored him, and then nearly six weeks later, after a court appearance, he purportedly attempted to commit suicide by cutting his wrist. Jefferson's claims are as follows:

Claim One   Defendants violated his Fourteenth Amendment rights when they "inflicted harm upon [Jefferson] when they acted callously and deliberately indifferent to his serious mental health needs." (Compl. 9.)

Claim Two   Defendants violated his Fourteenth Amendment rights when they "called him out amongst his entire peer group, and openly discussed his mental health issues without any attempt to protect his confidentiality." (*Id.* at 10.)

Claim Three   Defendants violated his Fourteenth Amendment rights when they "ignored [Jefferson's] repeated request[s] for help and treatment with follow-up requests." (*Id.*)

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.*

2

(quoting former Fed. R. Civ. P. 56(c), (e) (1986)). In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere "'*scintilla* of evidence'" will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). Nor can a nonmoving party "'create a genuine dispute of fact through mere speculation.'" *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.3d 213, 214 (4th Cir. 1985)). Accordingly, "[t]he nonmovant can show that a dispute is genuine only if it provides sufficient evidence so that a 'reasonable jury could return a verdict for the nonmoving party.'" *Wiggins v. DaVita Tidewater LLC*, 451 F. Supp. 2d 789, 796 (E.D. Va. 2006) (quoting *Anderson*, 477 U.S. at 248).

In support of their Motion for Summary Judgment, Defendants submitted their respective affidavits (Mem. Supp. Mot. Summ. J. Attach. 1 ("Gray Aff." ECF No. 47–1); *id.* Attach. 2 ("King Aff.," ECF No. 47–2); an affidavit of John D. McChesney (*id.* Attach. 3 ("McChesney Aff.," ECF No. 47–3), with attached copies of Jefferson's pertinent medical records (McChesney Aff. Ex. B–E (ECF No. 47–5 through 47–8)).[3]

As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. The Court previously warned Jefferson that "the Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law that is sworn to under penalty of perjury." (ECF No. 29, at 1.) Jefferson failed to comply with this directive. Instead, he filed an unsworn

---

[3] The Court employs the pagination assigned to Exhibits B through E by the CM/ECF docketing system.

Opposing Motion for Summary Judgment. ("Opposition," ECF No. 48.) The following day he filed a separate "VERIFICATION" for his Opposition, in which he states the following:

> I have read the foregoing Opposition for Summary Judgment and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

(Verification 2, ECF No. 48–2.) Such a statement fails to transform the statements in the Opposition into admissible evidence. *Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *2–3 & n.5 (E.D. Va. June 1, 2011) (treating statements sworn to under penalty of perjury, but made upon information and belief as "'mere pleading allegations'" (quoting *Walker v. Tyler Cty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001))). Jefferson also failed to file an affidavit or sworn statement as required by Federal Rule of Civil Procedure 56 despite the Court's prior warning that he must do so. (*See* ECF No. 29, at 1–2 (citing Fed. R. Civ. P. 56(c)(4))).[4]

Furthermore, no need exists to catalog the entirety of inadmissible evidence previously submitted by Jefferson because he fails to cite to the Court any evidence, such as his Complaint,[5] that he wishes the Court to consider in opposition to the Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(c)(3) (emphasizing that "[t]he court need consider only the cited materials" in deciding a motion for summary judgment); *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n.7 (5th Cir. 1992)) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."). Jefferson's failure to submit admissible

---

[4] Jefferson uses the same language at the end of his Response to the Defendants' Rebuttal. (ECF No. 51, at 5.)

[5] Jefferson's Complaint contains the same faulty Verification as in his Opposition. As explained above, such statements fail to transform the allegations in the Complaint into admissible evidence. *Hogge*, 2011 WL 2161100, at *2–3 & n.5.

4

evidence permits the Court to rely solely on the submissions of Defendants in deciding the Motion for Summary Judgment.

In light of the foregoing principles and submissions, the following facts are established for the purposes of the Motion for Summary Judgment. All permissible inferences are drawn in favor of Jefferson.

### III. UNDISPUTED FACTS

On approximately February 19, 2012, Jefferson became an inmate at the Henrico County Jail, where he had been previously incarcerated in 2010. (*See* McChesney Aff. Ex. B; *id.* Ex. E, at 7.) At some point in the next week, Jefferson submitted a request to be seen by mental health services stating that he was bipolar and needed medicine and was experiencing sleeping problems. (Compl. 7; *See* ECF No. 23-1, at 1.)[6] Defendants, certified mental health pre-screeners, met with Jefferson on February 29, 2012 in response to his request. (Gray Aff. ¶ 5.) Defendants explain that in their role, they "determine whether individuals need a temporary detention order because they are homicidal, suicidal or otherwise cannot care for themselves." (Gray Aff. ¶ 1; *see* King Aff. ¶ 1.)

Prior to the meeting, Defendant Gray prepared for the meeting by reviewing Jefferson's inmate request form, referred to as a "blue note," and his past and current medical and health records. (Gray Aff. ¶¶ 4–5.) In Jefferson's records, Defendant Gray reviewed a Mental Health Appraisal conducted at the jail by another clinical psychologist, Ms. Onzie Luke, during Jefferson's incarceration in 2010. (*Id.* ¶ 5.) In the assessment, Ms. Luke specifically noted that "Jefferson admitted enjoying 'mind games' and 'manipulation.'" (*Id.*) Defendant Gray explains that "[s]uch candid admissions are unusual even in a jail setting where inmates often attempt to

---

[6] As previously explained, Jefferson's Complaint fails to constitute admissible evidence. Nevertheless, the Court includes allegations contained therein when their inclusion is necessary to make sense of Jefferson's claims.

5

manipulate jail staff to secure advantages other inmates do not have." (*Id.*) Defendant Gray avers that Jefferson's past "statements made me wary that Jefferson might attempt to take advantage of Ms. King and me during our interview." (*Id.*) Defendant Gray also reviewed an Inmate Mental Health Screening and Assessment form completed by a jail nurse who interviewed Jefferson upon his recent admission to the jail. (*Id.* ¶ 6.) Defendant Gray explains that the nurse noted that

> Jefferson stated that he was not currently seeing a psychiatrist or mental health counselor, had never received mental health counseling in the past, was currently taking no medications for any mental health needs, and had never taken such medications. Jefferson further denied suicidal thoughts.

(*Id.*; *see* McChesney Aff. Ex. E, at 7.) Defendant Gray noted that these statements to the intake nurse contradicted the statements Jefferson made on the blue note he received. (Gray Aff. ¶ 6.) Defendant Gray avers that, "[t]hey also indicated to me that [Jefferson] likely did not have any significant mental health problem[s] that required active treatment. (*Id.*)

Defendants Gray and King worked as a team when they saw inmates because one person would interview an inmate while the other took notes. (*Id.* ¶ 7.) For security reasons, the clinical psychologists travel to where the inmates are housed to conduct interviews. (*Id.*) On February 29, 2012, Defendants met with Jefferson in an alcove off of a hallway near the day room. (*Id.*) As mental health counselors, Defendants Gray and King had no power to see Jefferson at the setting of their choosing. (King Aff. ¶ 6.) No inmates or persons were around to overhear or observe their interview of Jefferson. (Gray Aff. ¶ 7.) Defendant King confirms that "[w]e did not speak loudly enough for any other persons, including inmates, to overhear." (King Aff. ¶ 6.)

Defendants King and Gray had an adequate opportunity to assess Jefferson. (Gray Aff. ¶ 8.) He was alert and oriented, and his "[h]is mood was 'euthymic,' which means that he [was] not depressive or euphoric, but normal and reasonably positive." (*Id.*) Jefferson showed no signs of anxiety, depression, or psychosis, and "no evidence of severe mental illness or

6

intellectual disability." (*Id.* (internal quotation marks omitted).) Jefferson responded negatively when asked whether he was suicidal or likely to harm himself. (*Id.*; King Aff. ¶ 4.) Defendant Gray avers that "[i]f an individual keeps such plans secret and does not exhibit observable self-harming behavior, it can be difficult, if not impossible, to prevent a suicide attempt." (Gray Aff. ¶ 8.) Jefferson's statements and overall presentation demonstrated that he "was able to care for himself and faced no risk of self-harm at that time." (*Id.*)

Jefferson never indicated during this interview why he wanted to see mental health staff and he "did not repeat or endorse the statements made on his inmate request form." (*Id.* ¶ 9.) Jefferson mentioned a history of substance abuse although he appeared to not be completely truthful on the subject. (*Id.*) Defendants Gray and King urged him to participate in the jail's substance abuse program. (*Id.*) Jefferson indicated that he did not want to participate in the program. (*Id.*) Defendants Gray and King provided Jefferson with additional blue notes so he could ask to participate in jail programs and request additional mental health care. (*Id.*) Defendant Gray noted that mental health would follow up with Jefferson as needed. (*Id.*)

> Defendant Gray did not conclude that Jefferson had any significant need for mental health care, aside from the substance abuse treatment that he refused. Despite his written assertion that he had been diagnosed with bipolar disorder and needed medication, I saw absolutely no signs of such a disorder when I assessed him. Even if Jefferson had bipolar disorder at that time, such a disorder does not automatically raise a suspicion of suicidal intentions. If Jefferson were experiencing the difficulties reported on his request form, such as sleeplessness and loss of appetite, these deficits would have been typical of [a] new jail inmate accused of a serious crime. He did not report these problems to us, and they were not signs of a significant mental health problem. For this reason, I saw no need to refer Jefferson to the jail's psychiatrist. Furthermore, Jefferson did not give to us the name of any treating psychiatrist. As such, I had no ability to seek out any mental health treatment records for him from outside the facility.

(*Id.* ¶ 10.) Defendants Gray and King concluded that, as of February 29, 2012, Jefferson needed no mental health care assistance other than the support and encouragement they provided him during their interview and a referral to the substance abuse treatment program. (King Aff. ¶ 5.)

Defendant Gray avers that during the next five or six weeks, he had no reason to change his understanding of Jefferson's mental health presentation. (*Id.* ¶ 11.) Defendant Gray "understand[s] that Jefferson claims that he submitted another blue note requesting medication prior to his act of self-harm" but that he does "not recall ever receiving such a note and [he has] not seen one in [his] review of [Jefferson's] records from that time period." (*Id.*) Defendants Gray and King indicate that they were not assigned to follow Jefferson as their patient and had no continuing obligation to provide to care or monitor Jefferson, especially in light of their assessment that he needed no further care. (Gray Aff. ¶ 11; King Aff. ¶ 7.) Defendant Gray explains that "if Jefferson had submitted an additional blue note requesting mental health care prior to April 3, 2012, a sheriff's deputy would have delivered it to the mental health department generally and not to [him] personally." (Gray Aff. ¶ 12.) Any mental health professional would have responded on the same form, and the blue note would have been maintained in Jefferson's records and staff would have returned a copy to Jefferson with the response. (*Id.*) Defendant Gray avers that "[t]he absence of any request for mental health care in Jefferson's records, combined with his allegation that he never received a response, demonstrates that it is unlikely that the mental health department of the jail ever received such a request (assuming that he sent one at all)." (*Id.*)

### IV. ANALYSIS

#### A. Fourteenth Amendment Standard

The Due Process Clause of the Fourteenth Amendment "mandates the provision of medical care to [pretrial] *detainees* who require it." *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir.

2001) (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)). To survive a motion for summary judgment on a Fourteenth Amendment claim, Jefferson must demonstrate that the Defendants acted with deliberate indifference to his serious medical needs. *See id.*[7] A medical need is "serious" if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm . . . . [and] that the official

---

[7] "The due process rights of a pretrial detainee are at least as great as the [E]ighth [A]mendment protections available to the convicted prisoner," *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988), and courts apply the same standard to these claims. *See Brown*, 240 F.3d at 388.

9

in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that, "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### A.   Claim One

In Claim One, Jefferson contends that Defendants violated his Fourteenth Amendment rights when they "inflicted harm upon [him] when they acted callously and deliberately to his serious mental health needs." (Compl. 9.) He contends that "they ignored Plaintiff's cry for help" and he "needed help." (*Id.*) While he fails to specify what help he needed as of February 29, 2012, the Court construes Jefferson to argue that Defendants ignored his risk of suicide. As explained below, Jefferson's contentions are belied by the record.

"A substantial risk of suicide is certainly the type of 'serious harm' that is contemplated by the first prong of *Farmer*." *Brown*, 240 F.3d at 389 (citing *Gordon v. Kidd*, 971 F.3d 1087, 1094 (4th Cir. 1992)); *Buffington v. Baltimore Cty., Md.*, 913 F.2d 113, 120 (4th Cir. 1990). However, Jefferson fails to demonstrate that he suffered from a risk of suicide on February 29, 2012 when he met with Defendants. Instead, the undisputed facts conclusively demonstrate that he faced no substantial risk of suicide at that time. During his initial intake into the Henrico County Jail, Jefferson reported to the intake nurse no history of mental health issues, stated that

10

he was not taking any medications for mental health issues at that time, and had never taken such medications. (Gray Aff. ¶ 6.) He denied having suicidal thoughts. (*Id.*) Prior to meeting with Defendants on February 29, 2012, Jefferson put in a request to meet with mental health counselors because he believed he had bipolar disorder and needed medicine and had experienced a change in sleeping patterns. (ECF No. 23–1, at 1.) Defendants reviewed Jefferson's jail health records prior to meeting with him and noted no suicide risk or other mental health concerns. (Gray Aff. ¶¶ 5–6.) When Defendants met with Jefferson, they determined without difficulty that he presented no risk of suicide or self-harm and needed no mental health care at that time. (*Id.* ¶¶ 8–9.) Jefferson himself indicated that he was not suicidal or likely to harm himself in response to Defendants' questions. (*Id.* ¶ 8.)[8] Thus, the undisputed evidence demonstrates that Jefferson faced no substantial risk of doing harm to himself when he met with Defendants.

Jefferson further fails to demonstrate that Defendants Gray and King were deliberately indifferent to his suicide risk or purported mental health issues. The record conclusively demonstrates that Defendants King and Grey did not know of or disregard a substantial risk of harm to Jefferson. Prior to meeting with Defendants, Jefferson put in a request to meet with mental health counselors because he believed he had bipolar disorder and needed medicine. Defendants reviewed Jefferson's medical record to prepare for the meeting. Defendants interviewed Jefferson on February 29, 2012 and determined that he presented with no characteristics of bipolar disorder, a risk of suicide, or other significant malady. Jefferson notified them of no past or present mental health issues or prescribed medications, and he

---

[8] Indeed, in his Opposition, Jefferson admits that on February 29, 2012, he "did not feel suicidal nor was going to harm myself." (Opposition ¶ 5.)

indicated that he did not feel suicidal or that he was a risk of harm to himself.[9] Jefferson mentioned that he had past substance abuse problems and Defendants referred him to enroll in the treatment program, and offered him general support. Jefferson fails to demonstrate that Defendants acted with deliberate indifference to his risk of suicide or mental health issues. To the contrary, Defendants acted reasonably based on what they observed, Jefferson's medical records, and what Jefferson himself told them. *Brown*, 240 F.3d at 390. Accordingly, Claim One will be DISMISSED.

### B. Claim Two

In Claim Two, Jefferson claims that Defendants violated his Fourteenth Amendment rights when they "called him out amongst his entire peer group, and openly discussed his mental health issues without any attempt to protect his confidentiality." (Compl. 10.) To the extent that Jefferson even states a claim of deliberate indifference,[10] Jefferson's contention is again belied by the record. The undisputed evidence establishes that Defendants interviewed Jefferson in an

---

[9] In his Opposition, Jefferson suggests that Defendants somehow should have known that he was a suicide risk even though admittedly he was not suicidal on February 29, 2012. Jefferson's submissions exemplify Jefferson's admitted enjoyment of manipulation and mind games. Jefferson contends:
> Of course I didn't say I was thinking of suicide. I didn't feel that way and really wouldn't [have] known the feeling if so. It wasn't until I had no treatment and was turned away by these two individuals with a Master's Degree in clinical psychology did my depression [sink] in deeply and almost took my life. Stating on the request form 'I couldn't tell what kind of mood I was in' SHOULD have thrown up red flags to a professional in psychology.

(Opposition ¶ 7.) Notably, Jefferson never actually provides what "treatment" or "help" he desired that Defendants provide him with.

[10] Jefferson seemingly argues that Defendants were deliberately indifferent to his alleged constitutional right to medical privacy. It is doubtful that Jefferson enjoys a constitutional right to privacy in his medical treatment. *See Cooke v. U.S. Prisons*, 926 F. Supp. 2d 720, 736–38 (W.D.N.C. 2013) (second alteration in original) (internal quotation marks omitted) (citations omitted) (explaining that neither the United States Supreme Court nor the United States Court of Appeals for the Fourth Circuit "has [] held that an inmate has a constitutional right to privacy in medical treatment" but instead has held that "[e]ven for detainees, loss of privacy is an 'inherent incident[] of confinement'")).

area where no inmates or other persons could hear their interview or observe their interaction. (King Aff. ¶ 6.) Moreover, Defendants had no ability to control where they met with inmates. (*Id.*) Jefferson fails to demonstrate Defendants acted with deliberate indifference to Jefferson's medical needs when they interviewed Jefferson in an alcove off of the hallway near the dayroom. Accordingly, Claim Two lacks merit and will be DISMISSED.

C.   **Claim Three**

In Claim Three, Jefferson contends that Defendants violated his Fourteenth Amendment rights because they "ignored [Jefferson's] repeated request[s] for help and treatment with follow-up requests." (Compl. 10.)[11] Defendants aver that in their professional opinion, Jefferson needed no further mental health care, aside from the substance abuse treatment that he refused. (Gray Aff. ¶ 10.) Jefferson presented with no characteristics of bipolar disorder, depression, or other mental illness. (*Id.* ¶¶ 8, 10.) He did not appear to be risk at for suicide or otherwise need mental health care. (*Id.* ¶ 8.) Jefferson also denied being suicidal or likely to hurt himself. (*Id.*) Defendants saw no need to refer Jefferson to the jail psychologist. (*Id.* ¶ 10.) Moreover, neither Defendant retained a responsibility to monitor Jefferson's condition after the pre-screen interview. (*Id.* ¶ 11; King Aff. ¶ 7.) During the February 29, 2012 interview, Defendants provided Jefferson with additional blue notes to submit to the sheriff if he felt he needed further mental health care. (Gray Aff. ¶ 9.) A sheriff's deputy would have delivered the blue note to the mental health department generally, not to either Defendant personally. (*Id.* ¶ 12.) A mental health provider would have responded to Jefferson, and would have placed a copy of the note in

---

[11] Even Jefferson's own allegations contradict his assertion that Defendants ignored his repeated requests for help. Earlier in his Complaint he alleges that he submitted one mental health request form after the February 29, 2012 meeting with Defendants. (*Id.* at 7.) Jefferson claims that he put in the request "2 or 3 weeks later with no response. I addressed the blue note to either one of them because they have alread[y] spoken with me." (Opposition ¶ 5.) Thus, his allegation in his Complaint that Defendants ignored "repeated request[s]" is belied by his own submissions.

13

Jefferson's medical records. (*Id.*) Both Defendants aver that they never saw a second blue note from Jefferson or heard anything new about his condition. (*Id.* ¶ 12; King Aff. ¶ 7.) Moreover, no such request exists in Jefferson's medical records. (Gray Aff. ¶ 12.)

Jefferson fails to demonstrate that Defendants were deliberately indifferent to his alleged requests for help after the February 29, 2012 interview. The uncontroverted evidence establishes that neither Defendant received any other request from Jefferson after their February 29, 2012 interview. The record also demonstrates that Defendants had no reason to believe that Jefferson needed further mental health care or was a risk of harm to himself, and they had no ongoing duty to monitor him. Jefferson fails to demonstrate that Defendants actually knew of and disregarded a substantial risk of serious harm to his person after February 29, 2012. *See Farmer*, 511 U.S. at 837. Accordingly, Claim Three will be DISMISSED.

V. CONCLUSION

The Motion for Summary Judgment (ECF No. 46) will be GRANTED. Jefferson's claims and the action will be DISMISSED.

An appropriate Order shall accompany this Memorandum Opinion.

Date: 7/1/16
Richmond, Virginia

/s/
John A. Gibney
United States District Judge